JOSEPH B. JOHNSON

*v.*

TENNESSEE OIL, &C., COMPANY et al.

[Decided March 31st, 1908.]

1. Under the New Jersey statutes a payment for stock in property fraudulently overvalued may be questioned by a receiver representing creditors, since an issue of stock under such circumstances is a violation of the letter and spirit of the Corporation act, and is to be treated as absolutely void with respect to creditors, leaving the stockholders within reach of the sections of the act providing a remedy for creditors against stockholders for the amounts unpaid on stock.

2. *Rev. Stat. Ariz. 1901 p. 306 ¶ 765 § 5* provides that corporations may exempt the private property of members from liability for corporate debts. Paragraph 776 § 16 provides that nothing therein shall exempt stockholders from individual liability to the amount of the unpaid installments on stock owned by them. The original charter of a company provided that the capital stock should be fully paid up and non-assessable, and authorized the sale of certain treasury stock by the board of directors for property, services, or things of value which they might deem a just equivalent, and it also provided that private property of the stockholders and officers should be exempt from corporate indebtedness, and that all stock should be issued as fully paid and non-assessable. Certain stock of the company was paid for in overvalued property, and the stockholders were sought to be held liable for the balance of the face value of their stock as upon an unpaid installment.—*Held*, that the statute could not be construed so as to render stockholders liable where no further payment of installments on the stock was contemplated.

3. While stockholders holding stock paid for by overvalued property would be liable to existing creditors under the equitable principle known as the "trust fund" theory of capital stock, the rule does not apply to subsequent creditors who had knowledge of the fraudulent issue of the stock when they extended the credit.

4. The ultimate liability of a stockholder in a foreign corporation for payment of corporate debts depends on the law of the state of incorporation, and not on the law of the forum, which merely affects the remedy for enforcing the liability; and hence, in a suit seeking to hold stockholders in an Arizona corporation liable for debts of the corporation, the liability of the defendants will depend on the laws of Arizona, subject as to parties and procedure to Laws 1897 (*P. L. p. 124 § 2*), requiring suits to enforce a statutory personal liability to be by a suit in equity for an accounting to which the corporation and all the stockholders are parties, and not by an action at law.

5. The liability of stockholders of a foreign corporation in an equitable action is to be enforced according to the statutes of the foreign state, and the construction of its courts should be adopted and their decisions should control so far as the controlling principles have been declared; but, where the courts have made no decisions bearing upon the liability of stockholders on general principles of equity, the principles generally agreed on by the weight of authority should be followed, in the absence of any clear decisions of the local courts on the subject settling other rules.

. 6. In a suit by a director of a corporation who had acted as counsel for the company to enforce the liability of the stockholders individually as for unpaid installments on stock purchased with overvalued property, where it appeared that complainant had advised the directors, who were the stockholders, of the fraudulent character of the issue of its stock as fully paid, and after his election as a director accepted the appointment and voted for the adoption of an amendment reducing the amount of treasury stock which was to be sold and declaring the whole capital stock fully paid up and non-assessable, and his information as to the circumstances and consideration of the issue and payment were confidential communications, he should have advised his clients that he intended to make use of the information as a basis for future claims, and was estopped from contending that subsequent services were rendered in reliance on the general liability of the directors and stockholders as for unpaid installments on previous issues of stock paid for in overvalued property.

7. Where directors who, as stockholders in a corporation, are under no legal liability in their individual capacity for any indebtedness of the company, voluntarily agree to an assessment by a resolution, there is no liability on the part of those not assenting to the resolution.

8. Where the stockholders of a corporation are not individually liable for an indebtedness, a consent to an assessment on the part of the stockholders is not an agreement with the creditors of the company to guarantee its debts to the creditors, but is a mutual agreement to contribute, under which the consenting stockholders are liable for expenses incurred by the company in reliance on and in connection with the assent to assessment.

9. The fact of the consent to an assessment and the request that the company incur obligations may be proved by oral evidence and by the acts of the stockholders.

10. Where liability of stockholders of a corporation is based on an assessment consented to for a particular purpose, and not on a statutory or charter liability or corporate debt, the liability may be enforced through the company only.

11. Stockholders of a company who have agreed to voluntarily contribute are not bound in a suit in equity by a judgment against the company either as to its character or amount, where they were not parties to the suit and the circumstances attending the recovery of the judgment deprive it of the character of conclusiveness.

12. Where the directors as stockholders of a corporation voluntarily agreed to contribute in a certain proportion for the payment of current expenses, &c., an action by one rendering services to the company in

reliance on such agreement against the stockholders as such on the agreement to contribute is one where a court of equity alone can do ample and complete justice to all the parties and in a single action, especially where an accounting is necessary because of certain payments already made, and an equity court should not refuse jurisdiction on the ground of an adequate remedy at law.

13. No personal decree can be rendered against one who is not served within the state and does not appear.

14. Where a resolution is passed by the directors of a corporation for a voluntary contribution when there was no legal liability of the individual stockholders, and some of the stockholders paid the assessment partly or in full, in an action against the stockholders individually on a firm indebtedness, each defendant is entitled to credit on his assessment for the amounts paid.

---

Heard on bill, answers, replications, decree *pro confesso* and proofs.

*Mr. Walter J. Knight,* for the complainant.

*Mr. Leo Stein* and *Mr. Frank E. Bradner,* for the defendants.

EMERY, V. C.

Complainant has recovered in this state a judgment against the defendant company, a corporation of the State of Arizona, and, on execution returned unsatisfied, files this bill on behalf of himself and all other creditors of the company, against the company and all of its stockholders and directors, for the general purpose of reaching equitable assets of the company for the payment of the judgment debt. No other creditors have applied to come in, and, upon the evidence, it would seem that there are no other creditors of the company than the complainant. The *first* source of assets applicable to the payment of this judgment debt of the company, asserted in the bill and at the hearing, is the right to recover from the defendants, as stockholders of the company, the amounts alleged to be unpaid on the stock respectively held by them. The stock was in fact issued to all of the defendants as full paid and non-assessable, and was all issued and received for property purchased, at a valuation agreed on by the incorporators, who at the time of the purchase constituted the board of directors and the only stockholders of the company.

It is now alleged that this property (oil and mining leases) was taken at a valuation which was excessive and fraudulent, and that as against creditors the stock must, therefore, be deemed to be unpaid. Under the New Jersey statute such payment of stock by property fraudulently overvalued can be questioned by the receiver representing creditors, because such issue is a violation of the letter and spirit of our Corporation act, and is, as against creditors, to be treated as absolutely void for the purpose of payment, thus leaving the stockholders within reach of the sections of the act providing a remedy for creditors against stockholders for the amount unpaid on his stock. *Easton National Bank* v. *American Brick, &c., Co.* (appeals of Potter and others), *70 N. J. Eq.* (*4 Robb.*) *722; S. C.* (appeals of Green and others), *70 N. J. Eq.* (*4 Robb.*) *732 (Court of Errors and Appeals, 1905).* The liability of the defendants as stockholders, to creditors of the company upon their stock, depends on the laws of Arizona, subject as to parties and procedure to our own act of 1897 (*P. L. p. 124 § 2*), requiring in such cases the suit for enforcing a statutory personal liability to be not an action at law, but a suit in equity for an accounting, to which the corporation and all of the stockholders are parties. In reference to the liability of an individual stockholder for debts of the company, the Arizona statute provides (*Rev. Stat. 1901 p. 306 ¶ 765 § 5*) : "That bodies corporate shall have the power to exempt the private property of members from liability for corporate debts." The only statutory qualification of this power is by section 16 of the act. *Rev. Stat. 1901 p. 308 ¶ 776.* "Nothing herein shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid installment on the stock owned by them, or transferred to them for the purpose of defrauding creditors, and an execution against the corporation to that extent may be levied upon the private property of an individual." The original charter of the company, filed November 18th, 1901, provided that the capital stock, one million two hundred and fifty thousand shares of one dollar each, should be fully paid up and forever non-assessable, two hundred and fifty thousand to be treasury stock to be sold at such price as the board of directors might direct, and the board were given express power "to sell or ex-

change the stock of the company upon such terms and for such prices as they may agree on, and to take in payment therefor any real or personal property, service or things, or things in value which they may deem a just equivalent," and it was also expressly provided, article 8, "that the private property of the stockholders and officers of said corporation is to be and shall be forever exempt from all corporate indebtedness," and by article 9, "that all stock of the corporation shall be issued as fully paid and non-assessable, and that none be issued except in accordance with the rules of the board of directors." By an amendment to the charter, filed February 19th, 1902, the treasury stock to be sold by the board was reduced to $25,000, and the capital stock was reaffirmed to be fully paid and forever non-assessable.

As to the language of the Arizona statute, which is widely different from the New Jersey statute, on the liability of the stockholders for corporate debts, the only question, as it seems to me, is whether the liability of the stockholders asserted in this bill can be considered as an individual liability for an unpaid installment on the stock owned by them, and therefore excluded from the benefit of the provision of the statute and charter, "that the private property of members shall be exempt from corporate debts." I do not think this statute can be so construed, or that the exemption clause was intended to reach any cases except those of unpaid installments, properly so called; that is, cases whereby the contract between the company and the stockholders, express or implied, future payment of installments on the stock was contemplated on its issue. This clause does not seem properly to cover a case whereby the contract between the company and the stockholder, at the time of the issue of the stock, no further payment by installment or otherwise was contemplated, and where no debt to the company from the stockholder for this stock could subsequently arise, so long as the contract for its issue remained uncanceled. If this section be inapplicable, then the statutory and charter provisions that the private property of stockholders and officers shall be forever exempt from all corporate indebtedness, would exempt them in any cases where the liability is put solely on the liability for unpaid installment on stock owned.

No decisions of the Arizona courts have been cited on the construction of this clause holding that it extends to a case of overvaluation of property, whether fraudulent or otherwise, on its exchange for stock. On this point I follow, therefore, what seems to be the plain result of the language of the statute and the charter authorized under it, and conclude that the private property of the defendant stockholders whose stock was issued and received as full paid, cannot be taken to pay the corporate debt under this execution. For a fraudulent use of the statutory and charter provisions, by the issue of stock for property at a fraudulent overvaluation, the holders of stock so issued would, however, remain subject to liability to creditors under the equitable principles generally referred to as the "trust fund" theory of capital stock. The capitalization in this case was so grossly excessive as to be fraudulent, and the complainant would be entitled to relief on this ground of fraud but for the fact that he was a subsequent creditor with full notice of the fraudulent overvaluation. The case therefore comes within the application of a rule or principle adopted by the highest authority, and by the great weight of authority in relation to the creditors who are entitled to avail themselves of relief on the ground of fraudulent overvaluation. This rule is that subsequent creditors, who had notice of the fraudulent issue when they extended the credit, cannot have relief, and the reason is that the right to relief, independent of any statutory provision, and so far as it depends upon general principles of equity bearing on the "trust fund" theory of capital stock, must be based on the creditors' reliance on supposed paid-up capital when the liability was incurred. *Coit* v. *Gold Amalgamating Co., 119 U. S. 343, 347 (1886)*, is the leading case, which, with others following it, are examined in the opinion of Mr. Justice Pitney in *Easton National Bank* v. *American Brick, &c., Co., 70 N. J. Eq. (4 Robb.) 732, 742, &c. (Court of Errors and Appeals, 1905)*. This decision was based on the construction of our statute and overruled Vice-Chancellor Bergen on the point that creditors whose debts were incurred with notice of the overissue could not be relieved. It was held that our Corporation act, under which the stock in question was issued, by its terms prohibited agreements for the

issue of stock for a consideration less than its par value, and
that relief would therefore be given to all creditors without dis-
tinction (at p. 746). The question of the status of subsequent
creditors, with notice, where the liability of stockholders is placed,
not on the statute, but on the "trust fund" theory, was therefore
not involved in the case, and the expression of any opinion
thereon was reserved (at p. 745). The ultimate liability of a
stockholder in a foreign corporation, for payment of corporate
debts, depends on the law of the state of incorporation, not on
the law of the forum, the control of which goes no further than
the remedies for enforcing the liability. This liability is to be
enforced according to the statutes of the foreign state, adopting
the construction of its courts, and the decisions of the courts of
such states, so far as they have declared the principles controlling
the same. Where the courts have made no decisions bearing
upon the liability on general principles of equity, the principles
generally agreed on by the weight of authority should be fol-
lowed, in the absence of any clear decision in our own courts on
the subject settling other rules. I have not been referred to any
decision in the Arizona courts, and, in the absence of any express
decision in our own courts, I should follow the rule established
by the United States supreme court, which, so far as my exami-
nations go, has, wherever applicable, been followed, without ex-
ception, in the decisions of the state courts. In *State Trust Co.*
v. *Turner, 111 Iowa 664; 82 N. W. Rep. 1029; 53 L. R. A.
136,* this special subject is thoroughly discussed with a full refer-
ence to the authorities, and the statement is made that no case
has been found where a stockholder has been held liable on the
"trust fund" theory to a creditor who had full knowledge of the
facts relating to the issue and payment for the stock at the time
his debt was incurred. Relief was refused to such subsequent
creditor for this reason, either on the statute or the "trust fund"
theory, and, as the Iowa statute, on the points now involved,
seems to have been adopted in Arizona, this decision would be
of some weight on the question, whether, even if the claim be
treated as an action for an unpaid installment, the complainant,
as a subsequent creditor with notice, could have relief. And it
must also be considered that the status of the complainant, at

the time of the issue of the stock and of incurring the indebtedness now sued for, is such as to bring him within a special principle of exclusion.  He was the counsel and only legal advisor of the company at the time of the actual issue of the stock, and did, as he says, actually advise them of the fraudulent character of its issue as full paid.  His information from his clients as to the circumstances and consideration of the issue and payment were confidential communications, and if he intended to make them the basis of future claims in his favor, his clients were then entitled to be so advised.  In January, 1902, he was elected a director of the company, accepted the appointment and acted as such, and on February 1st, 1902, voted for the adoption of the amendment to the charter, reducing the treasury stock to twenty-five thousand shares and declaring the whole capital stock fully paid up and forever non-assessable.  This resolution for amendment, as well as the amendment itself, seem to have been drawn by complainant and on his advice as counsel for the company.  After the issue of the stock he accepted a considerable holding ($4,500) in payment of $500 of his bill rendered for services to May 1st, 1902, remaining unpaid, and agreed to this settlement before the rendering of the services now in question.  The directors individually contributed to this stock issued to complainant.  In view of his continuance as counsel and entering in the service of the company under the resolution of the directors of July 23d, 1902, specifying the amount of the liability of each person and its source as an assessment, and in view of the fact that the resolution seems to have been drawn by the complainant as the counsel of the company, I think that the complainant is specially estopped from now contending that any of his subsequent services were rendered in reliance on the general liability of any of the directors for the overvaluation of the property on the previous issue of stock.  If he intended that payment for his continued services as counsel should to any extent depend on the liability of the directors as stockholders for their previous fraudulent overissue of stock, and not on the liability limited in the resolution, they were equitably entitled to such information from their counsel before he allowed them to pass the resolution and accepted service on the faith of it.  The counsel, above all

other subsequent creditors, should be held to the strictest respon-
sibility for fair, equitable dealing with his clients, and the inequity
of now raising in counsel's favor, this secret equity against his
clients for the payment of services subsequent to the resolution,
seems to me to be clear. Complainant's claim, therefore, cannot
be sustained on the ground either of liability under the statute
for unpaid installments or on general principles of equity aris-
ing out of the fraudulent overvaluation of the property received
for stock.

The *second* claim for reaching, as assets of the company or
through its aid, funds for the payment of this corporate debt,
is based on a resolution of the directors of the company passed on
July 23d, 1902. Serious question had arisen whether an oil well,
which the company was then engaged in driving on Tennessee
lands, was actually located on the company's lands, and also as
to raising funds for the prosecution of the work. A meeting of
directors was called on special notice to consider the advisability
of directing complainant (the counsel of the company) to pro-
ceed to Nashville for the purpose of making investigations in
the interest of the company in his capacity as counsel, and fur-
ther to consider the question of levying an assessment on the
individual directors. At this meeting a resolution was passed

"that Counsel Johnson be directed to proceed to Nashville, ascertain if
leases were O. K., have surveys made of land covered thereunder and
ascertain if present well is on Carroll's land, held under lease by company
and get legal advice while on the ground and with general power to act for
the company in his capacity as counsel."

This resolution was adopted and apparently without dissent.
Then this motion was adopted:

"That each director be assessed $750, with the exception of Mr. Reit-
linger, who is to be assessed $1,700, the money realized from this assess-
ment to be placed in the company's treasury to meet current expenses and
cost of further development work."

At the time of this meeting the company had nine directors,
including the complainant, and of these six were present at the
meeting, viz., defendants Reitlinger, W. J. Roeber, Strauss,
Bondi and Meyer, and complainant. Three directors were ab-

sent, viz., Dunn, Zigrosser and L. C. Roeber. Meyer voted against the second resolution. As to the legal status of this resolution, the stock held by the directors being non-assessable under the statute and charter, it could not, in the absence of agreement, be binding on any stockholder or director not consenting thereto. *2 Cl. & Marsh Pri. Corp.* §§ *403, 404.* The resolution for assessment has in such case an aspect analogous to that of a mutual agreement by the directors with each other, to be assessed for a sum fixed, to be paid into the treasury for the benefit of a company in which they had a common pecuniary interest. There would seem no reason why an assessment on full-paid stock cannot be made by agreement of the stockholders, and such assessments by agreement are sometimes necessary to meet the exigencies of a company. And if stockholders consent to such assessment, including the fixing of the amount, there would seem to be no legal reason why the consenting stockholder should escape liability, if the company, relying on the consent, incurs subsequent obligations. The consent to an assessment is not, on the part of the stockholder, an agreement with a creditor of the company to guarantee its debt to the creditor, but is a mutual agreement to contribute, by means of an assessment, sums agreed on, to the company in which they are mutually interested for certain of its expenses, and these having been incurred by the company in reliance on and in connection with the consent to assessment, the stockholders consenting are liable, not to the creditor, but to the company, for reimbursement, and by assessment to the extent necessary. In such cases the promise to the company, and the request that it incur the obligations, may be proved by oral evidence and by the defendant's acts. *Barnes* v. *Perine, 12 N. Y. 18, 29 (1854).* In mutual agreements of this character, and on the strictest views of their effect, it is the general opinion that after debts or obligations have been incurred by the payee in reliance on the promises, and even where there is no pecuniary advantage to the promisor, the liability of each member for his subscription may be enforced through the common payee agreed on. *9 Cyc. 332; Roberts* v. *Cobb, 103 N. Y. 600, 604 (1886); Albany Presbyterian Church* v. *Cooper, 112 N. Y. 517; Cottage, &c., Church* v. *Kendall, 121 Mass. 528, 530 (1877).* This reso-

lution made the company the payee and the means of enforcing it, an assessment, which was substantially a *pro rata* assessment according to stock held by the directors, who were the only stockholders.

Mr. Johnson did within a day or two, and relying on the resolution, go to Tennessee on behalf of the company and perform for it the services required. He was engaged in this business from July 24th to August 19th, and his principal claim against the company is for this work. His actual expenses on the trip have been paid. In addition to the voting for the resolution, the defendants Strauss and W. J. Roeber on July 23d, 1902, the day of the meeting, signed a paper stating "undersigned ready to subscribe $750 to Tennessee, &c., Co. Treasury when called for," and the defendant Bondi on the same day signed a paper "ready to subscribe $750 to T., &c., Co. Treasury within 90 days from the date hereof." The director Meyer, who voted against the resolution on its passage, subsequently, on August 27th, 1902, assigned his stock in the company to defendant Reitlinger, who had voted for the resolution, the assignment containing the clause that it was "upon express condition and understanding that Reitlinger shall assume all assessments levied and to be levied against my said interest," and on September 8th, 1902, L. C. Roeber, one of the directors who was not present, also assigned all his stock and rights in the company to Reitlinger, the latter assuming and agreeing to pay all assessments now levied or to be levied against said interest. This assignment contained a further covenant to reassign a portion of the shares to L. C. Roeber, on payment within one year of moneys advanced by Reitlinger, as assessments or otherwise, on account of the interest conveyed. The assessment on the assignors assumed by these assignments include the assessment of July 23d, which appears to have been the only assessment made up to that time, and these assignments, at least in Reitlinger's hands, are sufficient, if not conclusive, evidence of the subsequent consent to the resolution of the two assignors, Roeber, who was not present at the meeting, and Meyer, who voted against it.

Dunn was not present at the passage of the resolution, but at the meeting of the board held on October 4th, 1902, at which he

was present, the minutes of the meeting of July 23d were read in his hearing and adopted, and he did in fact, subsequent to July 23d, pay $350 into the treasury. No other reason appears for payment than on account of the assessment and a supposed consent to this resolution. Dunn also, at a meeting of the board on January 3d, 1903, voted for a resolution that the directors pay complainant's bill, as then audited by him, by a *pro rata* assessment on their holdings of stock, and at a subsequent meeting Dunn voted to rescind this resolution of January 3d on the ground that the resolution of July 23d, 1902, covered the obligation, and, if complied with, would furnish all funds necessary to meet complainant's bill. These facts show conclusively, I think, that Dunn, although not present at the meeting of July 23d, 1902, did in fact otherwise consent to the resolution and assessment, and is bound thereby with all the others who actually consented at the time of voting for its adoption.

The defendant Zigrosser, also a director and stockholder, was not present at the meeting of July 23d, 1902. He was at that time general manager of the company and was superintending the work of putting down the wells in Tennessee, and his letters to the company, written in July, 1902, advising them of the dispute about location of the well, and requesting that the directors get together and send him help, in the form of a good business head, brought about the action at the meeting. Complainant saw and consulted with Zigrosser in Tennessee, and the latter subsequently paid to the company $150 apparently on account of the assessment. He also, on January 3d, 1903, voted for the resolution that the directors pay complainant's bill by a *pro rata* assessment on stock, but does not seem to have been present at the subsequent meeting, when this resolution was rescinded on the ground that the subject-matter of it was covered by the resolution of July 23d. His action, in part payment of the assessment and agreement for *pro rata* assessment, must be considered also in connection with the facts clearly disclosed by the evidence, that the enterprise was one in which the whole value of the stock was from the first purely speculative, and depended altogether on the development of the property, and that, in the absence of any working capital, the only source of funds was understood to be

the mutual contributions of the directors, who were, at the time of directing these expenditures, the only stockholders, and that the assessment then made was substantially a *pro rata* assessment. On the whole evidence, I think it is a just and fair inference that Zigrosser also knew of the resolution of July 23d and of the liabilities incurred by the company in reliance on it, and that he consented to it as binding upon him.

The only question of fact remaining as to the persons bound by the resolution of July 23d, 1902, is whether the complainant himself consented to his own assessment as a director. He was not at that time actually a stockholder of the company, and did not become such until some time subsequently (October, 1902), when he received stock in part payment of his bill for services up to May 1st, 1902. He had, however, been elected as a director on January 25th, 1902, and had accepted the office and acted as such since that time. He was, therefore, a *de facto* director of the company, and if it were a question relating to the effect of his acts in his capacity of director, the resolution, if he voted for it, would be conclusive on him. But this resolution or motion was, as I view it, legally effective only as an assessment or a mutual subscription on the part of those who actually agreed to it at the time or afterwards, and on this point complainant swears that at the time of the passage of the resolution he called the attention of the directors to the fact that, on the face of it, the resolution included him, and that they then said that he was not a stockholder and that he would not be called on to pay anything. At that time the other directors were in fact the stockholders and the only stockholders of the company. The complainant further says that he thinks he did not vote at all on the resolution. If these statements are true, then the complainant is not bound by any agreement for his own assessment. His statement as to what occurred at the time in reference to his own liability under the resolution is not denied, and the fact that no payments have ever been made by or claimed to be due from him, under the resolution, corroborates his evidence.

A disputed question of fact is raised as to the scope of the resolution actually passed and agreed to on July 23d, 1902. All of the answering defendants admit the passage of the resolution,

but say that the resolution as passed did not provide for a contribution for "current expenses," and that the contribution was only for drilling certain wells. But on this question the evidence of the complainant is more satisfactory, corroborated as it is by the resolutions themselves made at the time, and the further fact that afterwards the minutes of the resolutions were read in meetings where the defendants now contradicting them were present and without objection on their part.

At the hearing complainant insisted on an agreement of December 6th, 1901, as having the effect of making the defendants, or some of them, liable to another assessment, which the company might also recover as an asset to the extent that it was unpaid. But that document is an agreement inter-parties between six of the original incorporators, including five of the defendants of the first part, and the defendants Reitlinger and Strauss of the second part, whereby, in consideration of $2,000 paid to the other party, it was agreed that all of the parties should share equally in the property, profits, &c., of the company; that the parties of the first part should advance to the company "the said sum of $2,000, and further agreed to subscribe for and sell stock of the company to an amount not exceeding $2,150 as soon as conveniently may be, to the end that the best interests of said company may be served in the premises." The $2,000 paid by Reitlinger and Strauss was, in fact, as I understand the evidence, paid in to the company, and the company itself obtained no right by this agreement to compel the subscription. The benefit of this agreement and any action for damages for its breach belongs solely to Reitlinger and Strauss.

The *third* question relates to the amount of the complainant's claim recoverable on the assessment agreed to by the resolution of July 23d, 1902.

I shall not consider the questions of the general rules relating to the conclusiveness of judgments against the company in actions against stockholders or directors. Some of them are considered by Vice-Chancellor Bergen in *Audenried* v. *East Coast Milling Co., 68 N. J. Eq. (2 Robb.) 450 (1904)*. I think that in an action of this character, where the liability is based, not on a statutory or charter liability for a corporate debt, but on an

assessment consented to for a particular purpose, the right to recover by making an assessment is the right of the company only. The complainant here seeks to enforce this right of the company in this action, and for his benefit as a creditor, and, on general principles, I think the defendants who were not parties to the suit are not concluded by the judgment, either as to its character or amount, as being a claim included in the assessment they consented to. They are entitled to their day in court on this question and to raise the questions as against the company or a creditor claiming through it. And the special circumstances attending the recovery of this judgment deprive it, in a court of equity, of the character of conclusiveness. It was recovered by default, and, as appears by the bill of particulars and assessment of damages, is based on an account stated on January 3d, 1903. The proofs relating to this account stated or settlement show that on that day complainant's bill for $2,000 was approved by two members of the finance committee of the board, complainant himself and defendant Dunn, and was presented to the board of directors. This meeting was attended by the defendants Dunn, Strauss, Bondi, Zigrosser and W. J. Roeber and the complainant, the defendants Reitlinger and L. C. Roeber not being present. A resolution was passed reciting that the complainant's bill for $2,000 for services from May 1st, 1902, to December 31st, 1902, having been approved and audited by the finance committee, was ordered paid, and this was followed by another resolution, adopted unanimously (the complainant not voting), which, after reciting that the bill had been audited and approved by the finance committee, and ordered paid by the board of directors, resolved that the board obligated themselves to liquidate said indebtedness by an immediate personal *pro rata* assessment upon their several holdings of the capital stock as shown by the company's books at that date. This recital, that the bill had been approved by the finance committee, was the foundation of the resolution of the board approving the bill and assessing themselves for its payment. There was, in fact or in law, no such approval by the finance committee. This committee, as well as the executive committee, at that date, consisted of Reitlinger, the president of the company, Johnson, the complainant, and

defendant Dunn, who were so appointed by the board on October 9th, 1902. The by-laws of the company, article 8, section 2 (as amended January 18th, 1902, and February 1st, 1902), provided for the appointment of an executive committee which should act as an auditing and finance committee, and should be composed of three directors, one of whom should be the president, and two others appointed by the president and confirmed by the board. Defendant Reitlinger, then the president, and defendant Dunn, together with the complainant, constituted thus the executive and finance committee at the time Johnson's own bill was presented to the finance committee for approval. Reitlinger was not present at the meeting and had no notice of it, and would probably not have approved the bill. The bill was approved by Johnson himself, acting as a member of the committee, and by Dunn, who now says he did it at Johnson's request to bring it before the board. Johnson was incapacitated to vote and act as a member of the committee on his own bill, and the bill was therefore approved, not by the committee, but by only one member, and should have been so reported. The other member of the committee capable of acting as such, the defendant Reitlinger, was entitled as well as bound to give his judgment to the board, and the board and its members were entitled to his judgment before action thereon. The approval as to amount obtained under circumstances does not bind the members of the board as an admission for the purposes of this suit, and I therefore consider the questions of the indebtedness and the amount both open to be determined by the evidence in this suit showing the character of the services. The judgment, however, seems to have been regularly obtained, and while it is therefore conclusive as to complainant's status as a judgment creditor—*Minzesheimer* v. *Doolittle, 60 N. J. Eq. (15 Dick.) 394 (Court of Errors and Appeals, 1889)*—his right to have equitable relief for the payment thereof, by reason of this special assessment, extends only to the amount which may be found equitably due from these defendants to the company on their assessments. It was disputed on the facts whether the services of complainant, in going to Tennessee and his subsequent services, were to be paid for in any event, or were rendered on an agreement for payment only in

case the company's enterprise, or rather speculation, was success-
ful.    It was in fact, unsuccessful, and about January 1st, 1903,
practically suspended business and further attempt at develop-
ment.    On this disputed point I find in favor of complainant,
and conclude that he was to be paid for his services rendered on
the trip to Tennessee and his subsequent services.    It is admitted
that there was no agreement fixing the amount of compensation,
and this must, therefore, be such sum as under the evidence is a
reasonable sum.    After consideration of the evidence on this
point, I fix the amount at $1,250.

By the answers the issues in the cause were submitted to this
court without any question as to its jurisdiction, but at the hear-
ing and in the briefs it was insisted that the complainant had an
adequate remedy at law against each defendant separately.    With-
out considering whether the objection does not come too late, the
case, on the whole record, seems to be one where a court of equity
alone can do ample and complete justice to all the parties and in
a single action.    The case involves not only a settlement as
against each person liable, of the character and amount of claim
as coming under the assessments, together with an inquiry or
accounting as to the amount paid by each person liable, and an
adjustment of the amount due from each, but also the specific
relief of the appropriation of the amounts recovered under the
assessment to the payment of the debts specially included therein,
and not a payment to the company of amounts that go into its
general funds.    Multiplicity of suits at law, with possible diverse
or conflicting judgments on the same single issue, with a neces-
sity of ultimate resort to equity for an accounting, both against
the company and between the directors, would be the probable
result of refusing jurisdiction, and it should be retained.

I conclude, therefore, that the defendants Reitlinger, Bondi,
W. J. Roeber, Strauss, Zigrosser and Dunn are liable for the
amounts for their respective assessments under the resolution of
July 23d, 1902, so far as necessary to pay complainant's claim
as now fixed, and that to the same extent the defendant Reit-
linger is, in addition, liable to the amounts assessed against the
directors Meyer and L. C. Roeber assumed by him.    Meyer is not
a party to the suit, and L. C. Roeber has not been served within

the state and has not appeared in the suit. No personal decree, therefore, can be made against either of them on this voluntary assessment. Each defendant liable is entitled to credit for the amount paid to the company under.the resolution or on account of the assessment. On settling decree I will hear counsel as to further directions, including an accounting, if necessary.